RADIO CORPORATION OF AMERICA *vs.* RAYTHEON MANU-
FACTURING COMPANY & another.

Middlesex.   October 8, 1937. — March 30, 1938.

Present: RUGG, C.J., FIELD, LUMMUS, & QUA, JJ.

*Contract,* Construction, License to manufacture and sell patented article.

In view of all the circumstances and of the provisions, taken as a whole,
of a license to make and sell radio tubes, a clause in the license, "Sales
of Tubes by the Licensee to other licensees of the Licensors . . . shall
not be subject to payment . . . of royalty thereon," was not to be
construed literally, but the licensee's exemption from royalty was
limited to sales to other tube makers so licensed; he must pay royalties
on tubes sold to licensees holding licenses from the licensor to manu-
facture and sell radio receiving sets.
The conduct of the parties in performance of an ambiguous clause in a
contract for four years without seeking a judicial construction thereof
was evidence of its true meaning.
A clause, in a license to make and sell a patented article, providing re-
duction of royalty in case a lower rate was granted to a competitor,
was not applicable where the competitor obtained a more favorable
rate through judicial interpretation of the same clause in his contract.

BILL IN EQUITY, filed in the Supreme Judicial Court for the
county of Middlesex on August 15, 1934, for the determina-
tion of rights under a written contract.

After hearing on a master's report, a final decree was
entered by order of *Donahue,* J., reciting: "The words
'other licensees of the Licensors,' appearing in the second
sentence of said Section 4, must be construed as meaning
only other licensees of the Licensors who are licensed to
make and sell tubes and not as including licensees of the
Licensors who are licensed to make sets.   The license con-
tract required the defendant Raytheon Production Cor-
poration to pay to the plaintiff a royalty on all sales of tubes
made by it and sold by it to licensees of the licensors who
are licensed to make sets."

*E. F. McClennen*, (*E. C. Mower, Jr.*, with him,) for the defendants.

*R. Wait*, (*P. R. Chandler* of New York with him,) for the plaintiff.

QUA, J.   By means of this bill and cross bill the parties seek a construction by this court of Article Three, Section 4, contained in a "License Agreement" dated March 19, 1929, whereby Radio Corporation of America, together with General Electric Company and Westinghouse Electric and Manufacturing Company, granted to the defendant Raytheon Manufacturing Company a nonexclusive license to manufacture and to sell under patents owned or controlled by the licensors tubes for use in radio broadcast reception and in the reproduction of sound and pictures from "records."  See G. L. (Ter. Ed.) c. 213, § 3, Tenth A.  There are also prayers for further relief.

In this case, as in *Marcelle, Inc.* v. *Sol. & S. Marcus Co.* 274 Mass. 469, "no questions were raised by . . . [any] party relative to pleadings, to procedure under said . . . [§ 3, Tenth A], or to the right of the court to determine the issues raised" (page 471).  See *Standard Sanitary Manuf. Co.* v. *Hartfield Realty Co.* 284 Mass. 540; *Callahan* v. *Broadway National Bank of Chelsea*, 286 Mass. 473, 477; *Mutual Paper Co.* v. *Hoague-Sprague Corp.* 297 Mass. 294; *Merchants Mutual Casualty Co.* v. *Leone*, 298 Mass. 96; *Friedman* v. *S. S. Kresge Co.* 290 Mass. 114; *Corkum* v. *Clark*, 263 Mass. 378, 390.

The defendant Raytheon Production Corporation is the assignee of the defendant Raytheon Manufacturing Company.  As the interests of these two corporations for the purposes of this case are identical, they will be referred to without distinction simply as "defendants."

The license agreement is the same which was before this court on other issues in *Raytheon Manuf. Co.* v. *Radio Corp. of America*, 286 Mass. 84.  Article Three, Section 4, of which interpretation is now sought, reads as follows:

"Section 4.  The Licensee shall report the sale of any Tubes, obtained (subject, however, to the provisions of Section 5 of Article Five hereof) from other licensees of

the Licensors licensed to make and sell such Tubes and shall pay royalty thereon, in all respects as though they had been manufactured by the Licensee itself under this Agreement. Sales of Tubes by the Licensee to other licensees of the Licensors shall be reported to the Licensors, but shall not be subject to payment by the Licensee of royalty thereon."

It is the contention of the plaintiff that the words "other licensees of the Licensors" in the last sentence of Section 4 are to be construed as referring only to other licensees of the licensors who hold licenses for the manufacture and sale of tubes similar to the license granted by the agreement to the defendants, and therefore that the sentence does not exempt the defendants from paying to the plaintiff royalties upon sales of tubes to licensees holding licenses from the licensors to manufacture and sell radio receiving sets as opposed to tubes. It is the contention of the defendants that the words "other licensees of the Licensors·" are to be interpreted literally as referring to all other licensees of the licensors and therefore as exempting the defendants from the payment of royalties upon sales to the holders of the so called "set licenses."

The subsidiary facts mentioned in the following discussion were found by a master. When the agreement in question was made the plaintiff "had many other licensees of various kinds. These Licensees were permitted to manufacture amplifier devices, radio receiving sets, electric phonographs, motion picture devices and other articles covered by the patents of the grantor." When the present controversy arose the plaintiff had outstanding many set licenses, many tube licenses and many licenses to make the other devices hereinbefore mentioned. The license to the defendants was the first tube license granted. It was intended as a model for subsequent tube licenses. Its terms were considered with great care. Many preliminary drafts were prepared in conferences attended by executive and legal representatives of both parties. "When completed it represented the joint effort of the contracting parties . . . ." The tube licenses are all in the same form.

The set licenses are likewise all in the same form. The standard form of set license appended to the master's report and identified by the marking, "Exhibit 'B,'" grants a license in general terms for the manufacture and sale of "a complete radio receiver," but it also provides that nothing therein contained shall be construed as conveying any license to manufacture, use or sell "vacuum tubes," except such as shall be necessary "to make initially operative the apparatus licensed," and these are to be purchased from the plaintiff. Royalties are to be calculated upon the net selling price of "the apparatus licensed," except that no royalty shall be paid upon apparatus purchased from or through the plaintiff. It seems to follow that the set licenses do not require the payment of royalty with respect to the tubes which accompany the sets. The requirement that all of these tubes shall be bought from the plaintiff has evidently not been enforced in practice,* but there is nothing to show that set licensees ever paid royalties with respect to so much of the selling price of the sets sold as was represented by the tubes which went with them. It is plain that the tube licensees such as were the defendants acquired only the right to manufacture and to sell "Tubes" as defined in their licenses, and that these licenses were executed in the expectation that tube licensees would sell to each other. The Radio Corporation itself manufactures tubes. In six years ending in 1934 it made more than thirty per cent of its tube sales to its own set licensees. "This amounts to a very substantial sum." The tube licensees also sell large quantities of tubes to the set licensees. This also amounts to a very substantial sum.

It is not altogether easy for one not versed in the art to understand the full meaning of the definitions of tubes and

---

* See *Lord* v. *Radio Corp. of America*, 24 Fed. (2d) 565; *Radio Corp. of America* v. *Lord*, 28 Fed. (2d) 257; *Lord* v. *Radio Corp. of America*, 35 Fed. (2d) 962; *Radio Corp. of America* v. *De Forest Radio Co.* 47 Fed. (2d) 606. From statements in the plaintiff's brief apparently referring to a printed form transmitted to us with the exhibits attached to the master's report, but not itself marked as such exhibit, it would seem that the standard form of set license may have been revised at some time, so as to omit the requirement that set licensees purchase their tubes from the plaintiff. Other differences between the form herein mentioned and that marked as an exhibit and described in the opinion have no material bearing upon the case.

other articles contained in the licenses, and there are no findings explaining the terms used. We think, however, that from the findings and the documents generalizations may safely be made that the plaintiff intended that its set licensees and its tube licensees should constitute two mutually exclusive classes; that its set licensees should pay royalties upon the sets which they sold but not upon the tubes which they might furnish with them; that its tube licensees should pay royalties upon tubes; that neither class should encroach upon the province of the other; that tube licensees might sell tubes to each other without paying royalties; and that the plaintiff should remain free both itself to manufacture and sell under its patents and to grant such licenses as it saw fit of either class. It can be inferred from the extensive and careful negotiations, as well as from the terms of the resulting tube license agreement, that the defendants, when they took their license, knew of the manner in which the plaintiff proposed to have the business conducted; and it is further fairly inferable that the business has in fact been conducted in that manner.

In interpreting the last sentence of Section 4 hereinbefore quoted the defendants have the advantage that under their contention the words "other licensees of the Licensors" are construed literally and accurately without qualification as meaning all other licensees of the plaintiff. But a legal instrument is to be construed with reference to all of its language and to its general structure and purpose and in the light of the circumstances under which it was executed. These factors may qualify and control the literal signification of particular terms and phrases as effectually as if express qualifying words were found in the instrument. *Lovell* v. *Commonwealth Thread Co. Inc.* 272 Mass. 138, 140, 141. *Crimmins & Peirce Co.* v. *Kidder Peabody Acceptance Corp.* 282 Mass. 367, 375. *Morrill & Whiton Construction Co.* v. *Boston*, 186 Mass. 217, 220. Am. Law Inst. Restatement: Contracts, § 235, comment d. So here there are indications in the instrument itself, read in the light of the circumstances, which favor the plaintiff's contention that "other licensees of the Licensors" means other licensees

holding tube licenses like the license in which these words are found. The parties agree that Section 4 was inserted in order to make clear that double or multiple royalties were not to be collected upon tubes which had passed from one licensee to another. The first sentence of the section provides in substance that the royalty on such tubes shall be paid by the licensee who last handles the tubes and who sells outside the circle of licensees, while the last sentence provides that licensees earlier in the chain shall report their sales without paying royalty. If set licensees pay no royalty on tubes (and from what we have before us this seems to have been the fact throughout) there is no occasion, in order to prevent double royalties, for including set licensees among the "other licensees" mentioned in the last sentence, thereby exempting from royalties sales to them by tube licensees. Moreover the result of so including them and thus exempting sales by tube licensees to them would be to throw open the market for tubes created by the set licensees to exploitation by tube licensees without payment of royalties and in competition on equal terms with the plaintiff itself in respect to the large business which the plaintiff carries on in supplying tubes to set licensees. It seems unlikely that the parties intended that the plaintiff should thus lose the benefit of its patents in an extensive and important field. Under the plaintiff's interpretation the words "other licensees of the Licensors" in the last sentence are the equivalent of the words "other licensees of the Licensors licensed to make and sell such Tubes" in the first sentence, and the balance between the two parts of Section 4 is preserved. When the license agreement in question was made and thereafter the plaintiff had many licensees who were neither tube licensees nor set licensees, but who were licensed to manufacture various articles, including phonographs. It is hard to believe that all these licensees were actual or potential purchasers of tubes who were to be included among "other licensees." An examination of other parts of the license agreement discloses that the words "other licensees of the Licensors" or similar words are used in Article Two, Section 1, in Article Two,

Section 4, in Article Five, Section 4, and in Article Five, Section 5, in such connection that they can hardly be construed to mean any licensees other than tube licensees. See *Dana* v. *Wildey Savings Bank*, 294 Mass. 462, 465; *Alabama* v. *Montague*, 117 U. S. 602, 609, 610. The agreement throughout deals with tubes and tube licenses. Set licenses and set licensees are nowhere mentioned.

On the other hand it is argued with force by the defendants that the plaintiff continued in practical control of the licensing situation; that it might change in the future the form of its set licenses and its business policy so as to exact in some manner, directly or indirectly, royalties upon the tubes included in the sets sold; and that the defendants therefore need, and the license agreement was written to secure to them, protection against multiple royalties on tubes sold to set licensees.

For the purposes of this case we are not required to determine which construction we should adopt if the matter rested wholly upon the face of the instrument and the circumstances under which it was executed. There are further findings that the defendants' sole or principal purchaser of tubes was a set licensee to the defendants' knowledge for a considerable period of time after the execution of the license agreement, and that, nevertheless, the defendants paid "large sums" as royalties on sales to this purchaser. There is at least sufficient strength in the plaintiff's contention to show that the section of the instrument in question is ambiguous and to admit evidence of the construction placed upon it by the parties shortly after it was made. *Ovans* v. *Castrucci*, 267 Mass. 600, 605. Although the defendants have heretofore carried on extensive litigation against the plaintiff with respect to the sums due for royalties and as to rebates claimed upon royalties paid, the defendants first made their present contention upon the construction of the instrument after the hearing of the former suit and more than four years after the date of the license agreement. When these facts are put into the scale, we are satisfied that the interpretation urged by the plaintiff is the true one.

The defendants base a further contention upon Article Three, Section 7, of the license agreement. That section provides, in substance, that if the licensors grant another license for the same purposes and for the same territory at a lower rate of royalty the defendants shall thereafter have the benefit of such lower rate upon equal terms. The master finds that a trial court in another State in an action to recover royalties brought by the plaintiff against another tube licensee interpreted a tube license in the same terms as the one here involved as excusing the tube licensee from paying royalties upon sales to set licensees. Thereupon the plaintiff was nonsuited and appealed, but later voluntarily dismissed its appeal and brought another action, which is now pending, for the same royalties in still another State. Whether or not the nonsuit was a final determination of the cause of action, it is plain that Section 7 referred to grants by the plaintiff of more favorable rates to others than it had granted to the defendants. That section had no reference to varying constructions which different courts might place upon the same words. It did not bind the plaintiff to accept everywhere the construction least favorable to it which might be adopted by any court.

An appeal by the plaintiff from an interlocutory decree denying a motion to recommit, although printed in the record, has become immaterial, has not been argued, and is not properly before us, as the plaintiff has not appealed from the final decree.

The final decree is to be modified by striking out the statement that the language of Section 4 of Article Three of the license contract is not ambiguous, and as so modified is affirmed with costs.

*Ordered accordingly.*