**COMMERCIAL UNION INS. CO., Plaintiff**

v.

**NORTH AMERICAN PAPER CO., Defendant**

**No. CIV. A. 00–30135–KPN.**

United States District Court, D. Massachusetts.

April 6, 2001.

Stuart G. Blackburn, Law Offices of Stuart Blackburn, Windsor Locks, CT, William e. Gericke, Cozen and O'Connor, Philadelphia, for Commercial Union Insur-

ance Co., as subrogee of Eastwood Carriers, Inc., Danco Industries, Inc., Plaintiffs.

Edward F. Mahoney, Stephen M. O'Shea, Martin, Magnuson, McCarthy & Kenney, Boston, for North American Paper Company, A division of Mississippi River Corporation, Defendants.

*MEMORANDUM AND ORDER WITH REGARD TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Docket No. 09)*

NEIMAN, United States Magistrate Judge.

This subrogation case seeks to resolve whether the implied coinsured doctrine— recognized by the Massachusetts Supreme Judicial Court in *Peterson v. Silva,* 428 Mass. 751, 704 N.E.2d 1163 (1999), *Lexington Ins. Co. v. All Regions Chem. Labs, Inc.,* 419 Mass. 712, 647 N.E.2d 399 (1995), and *Lumber Mut. Ins. Co. v. Zoltek Corp.,* 419 Mass. 704, 647 N.E.2d 395 (1995)— applies to a particular commercial lease between the defendant, North American Paper Company ("North American"), and Eastwood Carriers, Inc. ("Eastwood"), an insured of the plaintiff, Commercial Union Insurance Company ("Commercial Union"). The parties have consented to this court's jurisdiction. *See* 28 U.S.C. § 636(c). For the following reasons, the court will allow North American's motion for summary judgment with regard to all claims asserted by Commercial Union as subrogee of Eastwood, but will dismiss, without prejudice, the remaining claims asserted by Commercial Union as subrogee of Danco Industries, Inc. ("Danco").

I. *SUMMARY JUDGMENT STANDARD*

A court may grant summary judgment pursuant to FED. R. CIV. P. 56(c) if "there is no genuine issue as to any material fact" and "the moving party is entitled to a

judgment as a matter of law." Once the moving party has asserted that no genuine issue of material fact exists, the burden is on the opposing party to point to specific facts demonstrating that there is, indeed, a trialworthy issue. *National Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir.1995). A "genuine" issue is one "that a reasonable jury could resolve ... in favor of the nonmoving party." *McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir.1995). *Accord United States v. One Parcel of Real Property, Great Harbor Neck, New Shoreham, R.I.*, 960 F.2d 200, 204 (1st Cir.1992).

Not every genuine factual conflict, however, necessitates a trial. " 'It is only when a disputed fact has the potential to change the outcome of the suit under the governing law if found favorably to the nonmovant that the materiality hurdle is cleared.' " *Parrilla–Burgos v. Hernandez–Rivera*, 108 F.3d 445, 448 (1st Cir. 1997) (quoting *Martinez v. Colon*, 54 F.3d 980, 983–84 (1st Cir.1995)). At bottom, matters of law are for the court to decide at summary judgment. *Blackie v. Maine*, 75 F.3d 716, 721 (1st Cir.1996).

## II. BACKGROUND

The facts of this case are undisputed. Commercial Union has brought this subrogation action against North American on behalf of two of its insureds, Eastwood and Danco. Eastwood owns a building at 170 Lockhouse Road in Westfield, Massachusetts, which was damaged by fire on August 12, 1997. Both Danco and North American were tenants in the building. The fire originated in a dumpster that, allegedly, was in North American's care, custody and control.

To date, Commercial Union has paid Eastwood for property damages to its building in excess of $145,000 and Danco for damages to its personal property in excess of $50,000. Commercial Union claims the fire was the result of North American's negligence and a breach of the lease agreement it had with Eastwood.

The lease is a commercial property lease that ran from December 1, 1994, through November 30, 1997. As lessee, North American paid Eastwood over $7,000 per month. In addition, the lease contained the following "yield-up" clause:

> Not later than fifteen days from the last day of the term lessee shall ... surrender the premises in as good condition as they were at the beginning of the term, reasonable wear and tear and damage by fire, the elements, casualty, or other cause not due to the misuse or neglect by lessee or lessee's agents, servants, visitors, servants or licensees, excepted.

(Docket No. 15: Commercial Union's Brief, Exhibit A at 2, third paragraph.) The lease also contained these additional provisions:

> Lessee shall commit no act of waste and shall take good care of the premises and the fixtures and appurtenances therein, and shall, in the use and occupancy of the premises, conform to all laws, orders and regulations of the federal, state, and municipal government or any of their departments.
>
> . . . .
>
> Lessee shall not do or suffer anything to be done on the premises which will by the nature thereof itself cause an increase in the rate of fire insurance on the building.
>
> . . . .
>
> If the building is damaged by fire or any other cause to such extent that the cost of restoration, as reasonably estimated by lessor, will equal or exceed 60% of the replacement value of the building as same existed, just prior to the occurrence of the damage, then lessor may,

no later than the seventh day following the damage, give lessee a notice of election to terminate the lease. In the event of such election this lease shall be deemed to terminate as of the date of the damage or destruction, and lessee shall surrender the premises within a reasonable time thereafter, and any prepaid rent shall be refunded proportionately.

. . . .

Lessor shall make repairs, except where the repair has been made necessary by misuse or neglect by lessee or lessee [sic], to the structural items defined as the roof, walls, and items within the walls electrical, heating, and cooling systems, floor, structural support, doors, and water and sewer or septic systems (both lavatories and sprinkler). All other repairs shall be the sole responsibility of the lessee.

(*Id.* at 2, second and fifth paragraphs, and 3, second and sixth paragraphs.) It is undisputed that the lease was drafted by representatives of Eastwood. (See Docket No. 09: North American's Brief, Exhibit B (Robert Snyder Affidavit) ¶ 3.)

Robert E. Snyder, North American's Vice President of Sales, avers that at the time he executed the lease, he understood that Eastwood "would obtain property insurance to cover any fire damage to the building and that the rent paid by North American would be used, in part, to cover the cost of procuring such insurance." (Snyder Affidavit ¶ 4.) As a result, North American did not itself procure property insurance to cover the building; it obtained only personal property insurance.

## III. Discussion

North American claims that, pursuant to the lease it entered with Eastwood, it is an implied coinsured under the Commercial Union policy procured by Eastwood. As such, North American contends that Commercial Union cannot maintain this subrogation action insofar as it is based on that policy. *See Peterson,* 428 Mass. at 752, 704 N.E.2d 1163 ("It is well established that an insurer cannot recover by means of subrogation against its own insured.") (citation and internal quotation marks omitted). For its part, Commercial Union contends that, unlike the defendants in *Peterson, Lumber Mutual Ins.* and *Lexington Ins.,* North American cannot be considered an implied coinsured under the lease.[1]

The implied coinsured doctrine has sparked some controversy. Two of the three key Supreme Judicial Court decisions were decided over strong dissents. *See Lumber Mutual Ins. Co.,* 647 N.E.2d at 397 (O'Connor, J., dissenting); *Lexington Ins. Co.,* 647 N.E.2d at 400 (O'Connor, J., dissenting). *See also* John Dwight Ingram, *Should An Illinois Tenant Get the Benefit of The Landlord's Insurance,* 17 North Ill. U.L.Rev. 51 (1998) (discussing opposing views regarding implied coinsured doctrine). Moreover, the Supreme Judicial Court's approach to the implied coinsured doctrine differs from other jurisdictions', making the analysis that much more difficult. In the end, however, the court believes that Massachusetts law, as interpreted to date by the Supreme Judicial Court, requires with respect to this lease that North American, the tenant, be deemed an implied coinsured of Eastwood, the landlord, and that Commercial Union,

---

**1.** North American asserts without any opposition that, should the claim based on the Eastwood subrogation dissolve, the court would no longer have subject matter jurisdiction over the remaining Danco claim insofar as it amounts to less than the $75,000 jurisdictional threshold for diversity actions. *See* 28 U.S.C. § 1332.

Eastwood's subrogee, be barred from pursuing this action against North American.

## A. Legal Background

Given the complexities surrounding the implied coinsured doctrine, the court will describe, in some detail, the doctrine's evolution in Massachusetts. First, however, the court will briefly address lease interpretation.

### 1. Lease Interpretation

Where, as here, there are no factual disputes, the interpretation of a lease is a question of law and is, therefore, subject to a summary judgment determination. *See Derrig v. Wal–Mart Stores, Inc.*, 942 F.Supp. 49, 53 (D.Mass.1996); *Lexington Ins. Co.*, 647 N.E.2d at 400; *Lumber Mutual Ins. Co.*, 647 N.E.2d at 396. In fact, the parties in the case at bar appear content to have the court interpret the lease at issue.

If the terms of a lease are unambiguous, then it must be enforced according to those terms in accord with their ordinary and usual sense. *Ober v. Nat'l Cas. Co.*, 318 Mass. 27, 60 N.E.2d 90, 91 (1945); *Edwin R. Sage Co. v. Foley*, 12 Mass.App.Ct. 20, 421 N.E.2d 460, 465 (1981). However, if ambiguity exists, the court must "consider the entire instrument and the general scheme it reveals to determine the significance and meaning of the ambiguous terms." *Glick v. Greenleaf*, 383 Mass. 290, 419 N.E.2d 272, 276 (1981). In so doing, the court may look to the circumstances under which the parties formed the agreement. *Radio Corp. of America v. Raytheon Mfg. Co.*, 300 Mass. 113, 14 N.E.2d 141, 143 (1938). If ambiguity still exists, then the language of the clauses at issue is to be reasonably construed against the drafter. *See Merrimack Valley Nat'l Bank v. Baird*, 372 Mass. 721, 363 N.E.2d 688, 691 (1977); *Hubert v. Melrose–Wakefield Hosp. Ass'n*, 40 Mass.App.Ct. 172, 661 N.E.2d 1347, 1351 (1996).

### 2. The Implied Coinsured Doctrine in Massachusetts

*Lumber Mutual Ins.* and *Lexington Ins.* were decided on the same day in 1995. *Peterson* was decided in 1999. These three opinions form the basis of the implied coinsured doctrine in Massachusetts.

In *Lumber Mutual Ins.*, the Supreme Judicial Court held that the commercial tenant was an implied coinsured under a policy issued to the landlord. *Id.*, 647 N.E.2d at 396. The court's conclusion was based on three lease provisions: (1) a clause requiring the tenant "to maintain the leased premises in good condition, damage by fire and other casualty only excepted"; (2) a yield-up provision mandating the tenant, at the end of the lease, to surrender the premises "in good condition, damage by fire or other casualty only excepted"; and (3) a clause requiring the tenant to pay "as additional rent" fifty-six percent of the operating expenses, including "hazard and liability insurance on the whole of the premises of which the leased premises are a part." *Id.* According to the court, this language—together with an accompanying letter in which the landlord advised the tenant that, because of its contribution to the premium, it need no carry its own property insurance—made it "clear" that the landlord and the tenant were coinsureds. *Id.*

In dissent, Justice O'Connor argued that the majority's opinion was "bereft of any stated rationale." *Id.* at 397. "None of [the lease] provisions," Justice O'Connor pointed out, "explicitly or implicitly suggests that the tenant will be a coinsured or will be exempt from liability for its negligence in causing damage to [the lessor]'s building by fire." *Id.* at 397–98. Moreover, Justice O'Connor noted, courts

"should not construe a contract provision as exempting a party from liability for its own negligence." *Id.* at 398 (citing cases).

In *Lexington Ins.*, the Supreme Judicial Court relied on a yield-up clause similar to the one at issue in *Lumber Mutual Ins.* The clause provided that the tenants would "peaceably yield up the Demised Premises . . . in the same condition and repair as the same were in at the commencement of the term . . . damage by fire or other casualty . . . only excepted." *Id.*, 647 N.E.2d at 400. Based on this clause alone—and in the absence of the "additional rent" clause at play in *Lumber Mutual Ins.*—the court concluded that the commercial tenants in *Lexington Ins.* were exempt from tort liability to the landlord, and therefore to the landlord's fire insurance carrier, for fire damage caused by the tenants' negligence. *Id.* "If [the landlord] intended to exclude from its lease with the tenant fires negligently caused," the court continued, "it could have inserted such a limitation. It did not do so." *Id.* Accordingly, "the tenants were coinsureds with [the landlord]." *Id.*

Again, Justice O'Connor dissented, arguing as he did in *Lumber Mutual Ins.* that "[a]pparently, but without setting forth its reasoning, the court has concluded that, when a lease contains a yield-up clause like the one in this case, the [landlord] and the [tenant] somehow become coinsureds." *Id.* at 400. In contrast, Justice O'Connor noted, *Safeco Ins. Co. v. Capri*, 101 Nev. 429, 705 P.2d 659 (1985), "the principal case relied on by the court . . . , involved a lease that contained a provision by which the [landlord] was committed to provide fire insurance." *Lexington Ins. Co.*, 647 N.E.2d at 401. In Justice O'Connor's view, the lease before the court in *Lexington Ins.* was "significantly distinguishable from" the one in *Safeco Ins.* because it "d[id] not contain an undertaking by the [landlord] to furnish fire insurance protection." *Id.*

In *Peterson*, when Justice O'Connor was no longer on the court, the Supreme Judicial Court decided unanimously to uphold a summary judgment entered in favor of defendant-tenants on the basis of the implied coinsured doctrine. *Id.*, 704 N.E.2d at 1166. In doing so, the court appears to have gone beyond its holdings in both *Lexington Ins.* and *Lumber Mutual Ins.* Unlike the lease in *Lexington Ins.*, "[t]here was no yield-up clause in the lease between [the landlord] and the [tenants]." *Id.* at 1165, 647 N.E.2d 399. And, unlike the lease in *Lumber Mutual Ins.*, there was no explicit language in the *Peterson* lease requiring the tenants to contribute to premiums for the policy. *Id.* Even so, the court held that "absent an express provision in a lease establishing a tenant's liability for loss from a negligently started fire, the landlord's insurance is deemed held for the mutual benefit of both parties." *Id.* Indeed, the court found the tenants to be implied coinsureds despite another lease provision which required the tenants to indemnify the landlord for their "carelessness, neglect or improper conduct." *Id.*

### B. APPLICATION

In applying the above cases to the matter at hand, the court will first address *Lumber Mutual Ins.* and *Lexington Ins.* It will then turn to the heart of the matter, *Peterson*, the most recent Supreme Judicial Court decision construing the implied coinsured doctrine.

#### 1. Does Lumber Mutual Ins. or Lexington Ins. Apply Here?

Standing alone, *Lumber Mutual Ins.* does not support North American's position. Unlike the lease at issue there, Eastwood's lease contains no clause which requires North American, as a tenant, to

pay additional rent to cover part of Eastwood's hazard insurance. Moreover, there is no evidence here akin to the cover letter mentioned in *Lumber Mutual Ins.* which informed the tenant that it was not required to carry property insurance on the building. *See id.*, 647 N.E.2d at 395–96.

The yield-up provision at issue here is also different in one important respect from the ones at issue in both *Lumber Mutual Ins.* and *Lexington Ins.* In both those cases, surrender of damaged premises was only excepted in the event the premises were "damage[d] by fire or other casualty." *Lumber Mutual Ins. Co.*, 647 N.E.2d at 396; *Lexington Ins. Co.*, 647 N.E.2d at 400. Here, the yield-up exception applies to "reasonable wear and tear or damage by fire, the elements, casualty, or other cause *not due to the misuse or neglect by lessee.*" (Emphasis added.) In many ways, this awkwardly wrought phrase lies at the heart of the parties' dispute.

Commercial Union asserts that the "not due to the misuse or neglect by lessee" language limits each exception in the yield-up provision. Thus, damage by "fire" or the "elements" or other "casualty" caused by North American's negligence is not excepted from the condition in which North American must yield the premises at the end of the term. Accordingly, Commercial Union asserts, North American cannot seek shelter as a coinsured with Eastwood, but had to obtain its own property insurance coverage for damage it might negligently cause.

For its part, North American argues that applying the phrase "not due to the misuse or neglect by lessee" to each excep-

tion would render the yield-up provision meaningless since there would be no reason or need to itemize the exceptions; the lessee would simply be required to yield the premises at the end of the term in as good a condition as they were at the beginning of the term, reasonable wear and tear only excepted.

The best that can be said for the clause at issue is that it is inartfully drawn. In the end, however, it appears to the court that the clause applies to each potential cause of damage, i.e., fire, the elements or other casualty. This is not unreasonable. Even damage by the elements can be attributable to a tenant in certain instances, e.g., negligently failing to close windows in a warehouse in anticipation of an oncoming storm. Accordingly, *Lumber Mutual Ins.* and *Lexington Ins.* provide little guidance. This conclusion, however, does not end the court's inquiry for, as explained below, Commercial Union must still overcome *Peterson* in order to defeat North American's motion for summary judgment.

### 2. *What About Peterson?*

Commercial Union argues that *Peterson* is limited to residential, not commercial leases. As Commercial Union points out, the *Peterson* court does opine that "[e]xtending fire insurance coverage to the occupying tenants comports with public policy and with the realities of apartment renting." *Id.*, 704 N.E.2d at 1165. In this respect, the court was echoing *Safeco Ins. Co.* and its reliance on *Sutton v. Jondahl*, 532 P.2d 478, 482 (Okla.Ct.App.1975), a residential lease case. *See Safeco Ins. Co.*, 705 P.2d at 661.[2]

---

**2.** Commercial Union also cites a recent decision by Massachusetts Superior Court Judge John C. Cratsley in which he, at least initially, distinguished *Peterson* in just this way. *See Travelers Indemnity Co. of Ill. v. TGI Friday's,*

*Inc.*, Superior Court Civil Action No. 98–2777–C (Mem. and Order dated Jan. 28, 2000) (attached as Exhibit C to Commercial Union's Brief). As North American points out, however, Judge Cratsley vacated this

This court, however, is not so easily persuaded. First, *Peterson* does not explicitly limit itself to the residential context. Second, the four cases upon which *Peterson* principally relies, *Lumber Mutual Ins.*, *Lexington Ins.*, *Safeco Ins.* and *Alaska Ins. Co. v. RCA Alaska Communications, Inc.*, 623 P.2d 1216 (Ala.1981), all involve commercial leases. While, as described, the leases in *Lumber Mutual Ins.* and *Lexington Ins.*—as well as in *Safeco Ins.*, as Justice O'Connor points out—are distinguishable in certain ways from the lease at issue here, the distinctions do not turn on the residential/commercial axis. This is true for the lease at issue in *Alaska Ins.* as well.

*Alaska Ins.*, decided in 1981, recognized the trend denying landlords, and thereby their subrogees, the right to pursue damage actions against negligent tenants when the landlord covenants in the lease to carry fire insurance on the leased premises. *Id.*, 623 P.2d at 1218. The implied coinsured status of the tenant was dependent on a lease provision which "require[d] the landlord to obtain and keep in effect an insurance policy on the leased premises covering loss because of fire." *Id.* at 1217. *See also id.* at 1218–19. "Since the ordinary and usual meaning of 'loss by fire' includes fires of negligent origin," the court explained, "it would contradict the reasonable expectations of a commercial tenant to allow the landlord's insurer to proceed against it after the landlord had contracted in the lease to provide fire insurance on the leased premises." *Id.* at 1219.

Although no explicit covenant presents itself here, there is an implied covenant in the lease that Eastwood would obtain fire insurance. For one thing, the lease bars North American from doing anything on the premises which would "cause an increase in the rate of fire insurance on the building." It can be fairly inferred that such fire insurance was to be obtained by Eastwood and assumed that Eastwood had incorporated the base cost of such insurance in the rental amount. *See Liberty Mut. Fire Ins. Co. v. Auto Spring Supply Co.*, 59 Cal.App.3d 860, 131 Cal.Rptr. 211, 215 (1976) ("even an implied provision for fire insurance in a lease represents the agreement of the parties thereto that nonintentional loss by fire shall be paid ... only from the proceeds of the policy") (citing *General Mills v. Goldman*, 184 F.2d 359, 365–66 (8th Cir.1950)). In addition, Eastwood also reserved to itself in the lease the right to terminate the tenancy if the building was damaged by fire or any other cause. Taken together, these clauses illustrate that the parties *impliedly* intended that Eastwood would procure the necessary property insurance to cover fire loss on the premises. *See Bray v. Hickman*, 263 Mass. 409, 161 N.E. 612, 613 (1928) (in contract interpretation, a court should, "[s]o far as reasonably practicable[,] ... give[ ] a construction which will make it a rational business instrument and will effectuate what appears to have been the intention of the parties"); *Finn v. McNeil*, 23 Mass.App.Ct. 367, 502 N.E.2d 557, 561 (1987) (same).

Most importantly for purposes here, the landlord's obligation to obtain insurance in *Alaska Ins.* outweighed countervailing

---

opinion on August 18, 2000. In so doing, he accepted new evidence—e.g., deposition testimony and documents—demonstrating that the commercial tenant in *Travelers* was charged for and, in fact, had paid a portion of the lessor's building insurance premiums.

*Travelers*, supra (Mem. and Order dated Aug. 18, 2000) (attached as Exhibit A to Docket No. 16: North American's Reply). Citing *Lumber Mutual Ins.*, Judge Cratsley held that "payment of the premiums makes [the tenant] a coinsured under the policy." *Id.*

lease provisions which otherwise implied liability on the tenant's part. Interestingly enough, one of those countervailing provisions, referred to as a "redelivery clause," is quite similar to the "yield-up" provision here. It provided that the tenant would leave the premises "in as good a condition as received, excepting fair wear and tear and/or loss or damage caused by fire, explosion, earthquake or other casualty; provided that such casualty was not caused by the negligent act of the Lessee, its employees or agents." *Id.*, 623 P.2d at 1218. The court acknowledged that the cases on which it relied to deny the insurer's subrogation action had different surrender clauses, namely, clauses in which the latter phrase was not present. *Id.* at 1219 n. 2. "Nevertheless," the court noted, "we do not find this provision of the lease conclusive on the question of the tenant's liability for fire losses, and we ascribe correspondingly greater significant to the insurance clause of [the lease]." *Id.*[3]

 The distinctions between the lease here and those before the courts in *Lexington Ins.*, *Lumber Mutual Ins.*, *Safeco Ins.* and *Alaska Ins.* might well be deemed more significant were it not for *Peterson.* *Peterson* made clear what may have been left vague in both *Lumber Mutual Ins.* and *Lexington Ins.*, namely, the burden on landlords, whether residential or commercial, to make *explicit* the tenant's obligation to obtain property insurance. Thus, *Peterson* concluded that a lessor's insurer may not pursue a subrogation claim against a lessee unless there is "an express provision" to the contrary. *Id.*,

704 N.E.2d at 1165. The *Peterson* court was quite emphatic in this respect, stating that the lessor could have but did not "insist[ ] that the [tenants] maintain fire insurance." *Id.* at 1166. Its reliance on *Alaska Ins.* is similarly revealing. *Alaska Ins.* made clear that the lease itself must "establish[ ] the tenant's liability for loss from negligently started fires." *Alaska Ins.*, 623 P.2d at 1217.

Granted, the approach taken in *Peterson* stands in sharp contrast to another line of cases which allows a landlord's insurer to pursue a subrogation claim against a tenant unless there is an express agreement to the contrary. *See Acquisto v. Joe R. Hahn Enterprises, Inc.*, 95 N.M. 193, 619 P.2d 1237, 1239 (1980) ("In the absence of an agreement between the parties specifying which of them will carry fire insurance for the benefit of both parties, or an express clause in the lease relieving a party from his negligence, each party must bear the risk of loss for his own negligence."). *See also 56 Associates ex rel. Paolino v. Frieband*, 89 F.Supp.2d 189, 193 (D.R.I. 2000) (holding that courts have no authority to insert the names of additional insureds into a policy); *Neubauer v. Hostetter*, 485 N.W.2d 87, 88–90 (Iowa 1992) (similar). The difference in these two approaches—as predicted by Justice O'Connor—is not insignificant. Nonetheless, the Supreme Judicial Court's trilogy which ends in *Peterson* creates, in essence, a presumption of implied coinsurance when a landlord fails to make clear in its lease that the tenant needs to obtain its own insurance to cover the landlord's property in case of negligence.[4] While this court

---

**3.** Somewhat similarly, the commercial lease in *Safeco Ins. Co.* specifically provided that the landlord maintain fire insurance. *Id.*, 705 P.2d at 660. The court then went on at some length to explain the underlying policy of the implied coinsured doctrine, much of it

grounded in business practices and the allocation of risk. *Id.* at 660–62.

**4.** In this regard, *Peterson* quoted R.E. Keeton, Insurance Law § 4.4(b), at 210 (1971), as follows:

may have some reservations about *Peterson*'s ultimate conclusion, it sees no reason why *Peterson* does not apply here. In this respect, the court is "mindful that federal courts sitting in diversity at a plaintiff's election ought not steer state law into unprecedented configurations." *Santiago v. Sherwin Williams Co.*, 3 F.3d 546, 551 (1st Cir.1993) (citation and internal quotation marks omitted). The court thus turns to that application.

### 3. *Application of Peterson*

■ According to *Peterson*, the court must determine whether there is "an express provision in [the] lease establishing [North American]'s liability for loss from a negligently started fire." *Id.*, 704 N.E.2d at 1165. North American says no such provision exists. Commercial Union, in response, claims that the yield-up clause—as well as the provision requiring North American to repair structural damages to the premises caused by its "misuse or neglect"—requires that North American be liable for damages caused by its own negligence. This interpretation, Commercial Union argues, is bolstered by the clause requiring that North American "commit no act of waste."

For all the reasons discussed above, the court does not believe that any of the lease provisions cited by Commercial Union is "an express provision in [the] lease establishing [North American]'s liability for loss from a negligently started fire." *Peterson*, 704 N.E.2d at 1165. While this may well be considered a particularly strict approach, it is one which is controlled by the Supreme Judicial Court's trilogy of cases.

Probably it is undesirable, from the point of view of public interest, that the risk of loss from a fire negligently caused by a lessee be upon the lessee rather than the lessor's insurer. Allowing the lessor's insurer to proceed against the lessee is surely contrary to expectations ... [P]erhaps [the courts]

It is also an approach that comports with the understanding of North American's Vice President of Sales that Eastwood would procure property insurance out of rent paid by North American. Finally, to the extent there is any lingering doubt or ambiguity, the lease must be strictly construed against the drafter, here, Commercial Union's insured, Eastwood. At bottom, the court deems North American an implied coinsured with respect to the Eastwood claim and will enter judgment accordingly.

## IV. CONCLUSION

For the reasons stated, North American's motion for summary judgment will be granted with respect to the Eastwood claim. That being the case, and as agreed by the parties in such an event, the court will dismiss without prejudice the remainder of the suit, thereby allowing Commercial Union the opportunity to seek appropriate relief for the Danco claim in state court.

IT IS SO ORDERED.

should at least adopt a rule against allowing the lessor's insurer to proceed against the lessee when lease provisions are ambiguous in this regard and the insurance policy is silent or ambiguous.

*Id.*, 704 N.E.2d at 1165–66.